IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:09cr9

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| vs. | ) |
| | ) ORDER |
| LARRY WHITFIELD | ) |
| | ) |

**THIS MATTER** is before the Court upon its own directive to consider, under 18 U.S.C. § 3501, the admissibility of Defendant's "jailhouse" confession to attempted bank robbery given on September 27, 2008, at the Gaston County Jail.[1] Defendant is a 20-year-old male charged with bank robbery, conspiracy, use of a firearm during a violent crime, and causing death as a result of bank robbery. (Doc. No. 1: Bill of Indictment). The Court, after hearing trial evidence including the testimony of Detective William Sampson of the Gaston County Police Department and the audio/video recording of an interview of the defendant, held an evidentiary hearing on November 18, 2009, and received additional testimony from Detective Sampson concerning the voluntariness of Defendant's confession. Upon review, for the reasons stated below, the Court finds that Defendant's "jail house" confession was not voluntarily given and is therefore inadmissible.

---

[1] Reference to Defendant's last confession as the "jail house" confession is meant to distinguish it from other inculpatory statements made by Defendant during the initial parts of his interrogation, which the Court previously considered pursuant to Defendant's motion to suppress evidence (Doc. No. 35) and found to be knowingly and voluntarily made. That finding is not disturbed here.

1

## I. FINDINGS OF FACT

### A. The Interrogation

Following an attempted bank robbery on September 26, 2008, in Gastonia, North Carolina, Defendant was arrested by local police officers in a nearby area and detained at a city facility. Although Defendant was initially held in a city facility, Detectives Sampson and Sumner of the Gaston County Police Department were called in to initiate questioning, which began at approximately 7:30 p.m.[2] Defendant had been outside in the woods and was cold, wet, and visibly shaking for some of the interview. The interrogation initially focused on two homes that Defendant had entered while fleeing from police on foot. Detectives Sampson and Sumner led Defendant to believe that their interest was limited to breaking and entering the homes, one of which was occupied by an elderly woman. In reality, they hoped to charge him with attempted bank robbery, kidnapping of the elderly woman, and, because she had subsequently died of a heart attack, first degree felony-murder.

Before beginning the interrogation, Detective Sampson administered Defendant's Miranda warnings, stating that it was "no big deal" and just like Defendant had "seen on T.V." (TR at 6). In accordance with procedure, Sampson handed Defendant a copy of his Miranda rights and had him initial each individual warning. With regard to his right to remain silent, Sampson asked Defendant if he understood the right before directing him to initial the sheet. (Id.). With regard to subsequent Miranda rights, however, Sampson just directed Defendant to initial the sheet without inquiring if he actually

---

[2] The entire interrogation at the Gastonia facility was audio/video recorded and made available for the parties' and the Court's review. Thus, the Court was able to observe first-hand the demeanor, tone, and non-verbal expression of Defendant and his interrogators throughout. Additionally, a transcript of the recording ("TR") was prepared and is cited to herein.

understood what had been read. (Id.). Upon reading Defendant a concluding summary of his Miranda rights, instead of asking Defendant if he understood the summary, Sampson simply asked, "Is that cool, Larry?" and instructed him to sign. (TR at 7).

Detectives Sumner and Sampson then began to interrogate Defendant aggressively regarding the break-ins, but allowed him to give his narrative of the events. Defendant thus admitted to entering two homes while fleeing from police. Defendant signed a written statement to this effect prepared by Sampson at approximately 8:35 p.m., as both Detectives repeatedly expressed their appreciation for his forthrightness. (TR at 81-83).

After Defendant made this statement, however, the tone of the interrogation suddenly changed. Until then, neither Detective Sumner nor Sampson had asked Defendant why he had been running from police prior to his arrest. They had initially told Defendant that their jurisdiction only covered the break-ins, or, the "lesser of the evils," as Detective Sampson put it. (TR at 5). After Defendant's initial cooperation, however, Sampson and Sumner began to focus on the bank robbery, telling Defendant they wanted to "[g]et everything together, stack it up . . . [and] get it all over with." (TR at 87). Among numerous other misrepresentations, they lead Defendant to believe that Quanterrious McCoy, also charged in this case, had made statements implicating Defendant when he had not yet done so. (TR at 103). At one point, a third interrogator—a Sergeant Reynolds—entered the room and asked questions separate and apart from the questions of Sumner and Sampson. Thereafter, Sumner and Sampson's questioning became leading, mounting an assault on Defendant's repeated denials of his involvement in the attempted bank robbery with an arsenal of both real and fabricated evidence.

Detectives Sumner and Sampson then revealed to Defendant that, based on his previous statements

concerning the break-ins, he was "slam dunk one hundred percent" guilty of kidnapping in addition to breaking and entering and bank robbery. (TR at 118). They told Defendant repeatedly that his case would be hopeless if it were ever brought before a jury. (TR at 120). Throughout the interrogation, Sumner and Sampson lead Defendant to believe that his charges could be mitigated if he would only cooperate instead of holding out and acting like a "thug." (TR at 122). Defendant continued to deny his involvement. Sumner and Sampson then advised him at approximately 9:55 p.m., two and one-half hours after the interrogation began, that he would soon be transported to a Gaston County detention facility and presented with formal charges. Sumner noted that "[t]his is where it gets good." (TR at 124). The purpose of Sumner's statement was apparently to foreshadow the felony-murder charge they had yet to reveal.

Upon conclusion of this initial interrogation, however, Defendant was not transported to Gaston County. Instead, Defendant was subjected to another hour of interrogation by Detectives Wilson and McSwain of the Gastonia City Police Department. Wilson and McSwain picked up where Sampson and Sumner had left off, repeating again and again that they were in a position to help him, if only he would tell the truth. Referencing his earlier incriminating statements, McSwain told Defendant, "You told a lot of truth and it's gonna be a shame, a big shame that you have to be presented as a liar after telling all that truth." (TR at 158). Wilson told Defendant that after his inevitable conviction, his punishment would depend on whether he and other investigating officers presented him to the Court as an honest person who admitted to his mistakes or a "cold," "calculating," and "deceitful" criminal. (TR at 161). These and many other similar exchanges were intended to convince Defendant that his only chance to salvage his otherwise "bright future" was to confess to the attempted bank robbery. (Id.).

Defendant, however, remained steadfast in his refusal to admit to the attempted robbery. Detective

Wilson then told Defendant that:

> We're not gonna dance around the tree any more . . . . We've been here a while with you. No[w] you know in your heart what the truth is. You know it right now. [Look] at me Larry. you know what it is. You're this close, Larry, to telling me the truth. You're wanting to. I can see it in your eyes. I can see it. You're wanting to say what happened. But you're scared to say that.
> . . .
> Larry . . . be righteous. Be the stand up guy over here. Be him one hundred percent. . . . Tell me what happened today and we both walk out of here.

(TR at 172). Subsequently, Defendant attempted to end the interrogation by saying "I can't say no more. But I'm gonna plead, just plead my case that I got against me." (TR at 183). Wilson, however, overrode Defendant's attempt to end the interrogation and told him that "God didn't make us to lie." (TR at 185). Finally realizing that Defendant was unlikely confess at that time, Wilson wrapped up the interrogation and reminded Defendant that he would be available if Defendant wished to talk later. (TR at 200). Detective Sampson re-entered the interrogation room shortly before Defendant's transport to Gaston County, where he was later charged, and offered Defendant this warning:

> I think the last detective that was in here, one of the last things that he said is that you know, you, he invited you to get in touch with him. . . . Or contact him, if you, you know, want to own up and, and real soon you're, you're gonna wanna talk to him okay. . . . Real, real soon. So just remember what I just said.

(TR at 203).

**B.     The Confession**

At the evidentiary hearing conducted by the Court, Detective Sampson testified that his next contact with Defendant occurred later that evening at 12:15 a.m., September 27, at the Gaston County Jail, in a locked room adjacent to the booking area known as the "intoxilyzer room." Detective Sumner was also present. There, Sampson read Defendant the arrest warrant he had just prepared, charging him with

5

kidnapping, breaking and entering, and first degree murder. Sampson did not, however, explain that the first degree murder charge was based upon the theory of felony-murder. Upon finally discovering that he was being charged with murder, Sampson testified that Defendant looked at them and asked, "What can I do to help myself?" Although Sampson could not specifically remember doing so, he testified that he was sure he clarified Defendant's intent to re-initiate the interrogation by asking if he was sure that he wanted to talk. Sampson and Sumner then re-Mirandized Defendant in the same manner as they had done before, except that Defendant wrote the word "yes" instead of his initials in the margin next to each statement of his rights. Subsequently, Defendant confessed to the attempted robbery and signed another written statement to that effect prepared by Detective Sampson.

## II. DISCUSSION

Section 3501 to Title 18 of the United States Code governs the admissibility of confessions in federal criminal trials. A confession "shall be admissible in evidence if it is voluntarily given." Id. at § 3501(a). A confession is involuntary if the totality of circumstances surrounding the defendant's confession indicate that his will was overborne, or his capacity for self-determination was critically impaired. United States v. Cristobal, 293 F.3d 134, 140 (4th Cir. 2002); United States v. Pelton, 835 F.2d 1067, 1071 (4th Cir. 1987). Coercive police activity is a necessary predicate to finding that a confession was involuntarily made. Cristobal, 293 F.3d at 140 (citing Colorado v. Connelly, 479 U.S. 157, 167 (1986); United States v. Braxton, 112 F.3d 77, 780 (4th Cir. 1997) (en banc)). When making a determination of voluntariness, the Court must consider the following factors: (1) the time elapsing between arrest and arraignment of the defendant making the confession, if it was made after arrest and before arraignment; (2) whether such defendant knew the nature of the offense with which he was charged or of which he was

6

suspected at the time of making the confession; (3) whether or not such defendant was advised or knew that he was not required to make any statement and that any such statement could be used against him; (4) whether or not such defendant had been advised prior to questioning of his right to the assistance of counsel; and (5) whether or not such defendant was without the assistance of counsel when questioned and when giving such confession. Id. at § 3501(b). None of these factors, however, are necessarily conclusive. Id.

In addition to the factors enumerated in § 3501(b), the Court considers any other circumstances of the defendant's confession that bear upon its voluntariness, such as "the characteristics of the defendant, the setting of the interview, and the details of the interrogation." Pelton, 835 F.2d at 1071 (citing United States v. Wertz, 625 F.2d 1128, 1134 (4th Cir.), cert. denied, 449 U.S. 904 (1980)). These circumstances, in their totality, compel the Court to conclude that Defendant's confession was not voluntarily given.

### A. Time between Arrest and Arraignment

Defendant's initial arrest occurred shortly before his interrogation began at approximately 7:30 p.m., but he was not advised of his charges until approximately 12:15 a.m. later that evening. During the interim, Defendant was subjected to near-constant interrogation by multiple teams of interrogators while in the custody of the Gastonia City Police: he was interrogated for approximately two and one-half hours by Detectives Sumner and Sampson and for approximately one hour by Detectives Wilson and McSwain. Sergeant Reynolds also took over for brief periods during the latter part of Sumner and Sampson's questioning. There was little to no break in between these interrogations for Defendant, although Detective Sampson testified at trial that the interrogators took breaks to regroup. Thus, Defendant's experience more

closely resembled a single three and one-half hour interrogation—which escalated in intensity—rather than a series of separate interrogation sessions.

Defendant did, however, receive a break in interrogation during the hour it took to transport him Gaston County where he received his charges. Although "routine booking procedures do not constitute interrogation" because they simply inform a defendant of the charges against him, United States v. Taylor, 799 F.2d 126, 129 (4th Cir. 1986), this was not a typical booking procedure. Detective Sampson's prior comments to Defendant during the interrogation and Detective Sumner's comment that "[t]his is where it gets good" indicate that finally revealing his felony-murder charge was an orchestrated attempt by the interrogation teams to elicit his confession. On balance, the approximate five hour delay between Defendant's arrest and arraignment, which was filled by nearly constant interrogation, weighs against voluntariness.

### B. Awareness of the Nature of the Offense

Although Defendant was mislead throughout his interrogation regarding the seriousness of the charges against him, they were read to him shortly before he confessed. The fact that Defendant did not at the time understand that his first degree murder charge arose under the theory of felony-murder is not particularly significant because regardless, Defendant understood the seriousness of the murder charge. Thus, for purposes of this factor, the Court finds that Defendant was aware of the nature of the offenses for which he was charged at the time he made his confession.

### C. Awareness of Miranda Rights and Counsel's Presence

The next three factors under § 3501 concern whether Defendant had been properly advised of his

rights to silence and counsel before making his confession,³ and if so, whether counsel was present during his confession. Detective Sampson advised Defendant of his Miranda rights twice during the events leading up to his arrest. One of these exchanges was recorded as part of Defendant's interrogation at the Gastonia facility and reviewed by the Court. The Court finds that this attempt to advise Defendant of his Miranda rights, although executed in a mediocre fashion at best, was sufficient for the Court to answer these factors in the affirmative. As he began, Detective Sampson asked Defendant if he understood his right to silence before instructing him to initial the warning. (TR at 6). This ensured that Defendant had a meaningful understanding of his Miranda right to silence. As Sampson went through the form, however, he became more directive and simply instructed Defendant to mark his initials next to each clause. (Id.). At the conclusion of reading Defendant his rights, Sampson should have asked Defendant if he understood his rights in their entirety, or if he had any questions. Instead, Sampson said, "Is that cool, Larry?" and told him to sign. (TR at 7). He did advise Defendant of his Miranda rights a second time at his booking, although the nature of the execution of the warrant and the mediocre "result-oriented" fashion of the first Miranda warning give the Court less confidence that they were communicated in such a fashion that the Defendant could act on them.

Although performed in a less than ideal manner, the Court finds that Defendant was nevertheless advised of his right to remain silent and his right to counsel prior to his confession. These factors weigh in favor of voluntariness. Defendant had not, however, exercised his right to counsel and, consequently, none

---

³ The Court notes that its inquiry into these factors is not tantamount to an inquiry into whether Defendant's Miranda rights were violated, which would require an additional finding of custodial interrogation. United States v. Wright, 991 F.2d 1182, 1186 (4th Cir. 1993) (citing United States v. Rhodes, 779 F.2d 1019, 1032 (4th Cir. 1985).

9

was present for his confession. This factor, of course, weighs against voluntariness.

### D. Characteristics of Defendant and Details of the Interrogation

Looking to other relevant factors outside of those enumerated in § 3501(b), the Court finds that the characteristics of the defendant and the details of the interrogation weigh heavily against finding that his confession was voluntary. Pelton, 835 F.2d at 1071. When his questioning began, Defendant was cold, wet, only 20 years' old, and had never before faced any serious charges. See Wertz, 625 F.2d at 1134 (listing a defendant's "youth, experience, education, maturity, or intelligence" as relevant characteristics). These characteristics made Defendant especially vulnerable to the coercive interrogation tactics of Detectives Sumner, Sampson, Sergeant Reynolds, and Detectives Wilson and McSwain.

The details of Defendant's interrogation certainly indicate that it was coercive. Both interrogation teams made numerous misrepresentations to Defendant regarding the evidence against him, and, more egregiously, repeatedly implied that he would likely receive a lenient sentence if he confessed. Misrepresentations are often employed by law enforcement personnel without turning an otherwise voluntary confession into one that it is involuntarily given. Frazier v. Cupp, 394 U.S. 731, 739 (1969); see also Ledbetter v. Edwards, 35 F.3d 1062, 1070 (6th Cir. 1994) ("A defendant's will is not overborne simply because he is led to believe that the government's knowledge of his guilt is greater than it actually is."). Misrepresentation is, however, a factor that the Court may consider, especially when it is employed to imply a promise of leniency in exchange for a defendant's cooperation in the context of a larger strategy designed to break his will.

Defendant's interrogators overstated their ability to either grant him leniency if he confessed or enhance his penalty if he refused to do so. Detective Wilson told Defendant that he would address the

Court following Defendant's trial, and would describe him to the judge as "cold," "calculating," and "deceitful" if he refused to confess. (TR at 161). On the other hand, if he confessed, Wilson told Defendant that he "could work around this stuff . . . and still have [a] bright future." (Id.). At one point, Wilson told Defendant, "Tell me what happened today and we both walk out of here." (TR at 172). This promise of leniency in exchange for cooperation was repeated throughout by both teams of interrogators. Although the Court does not find that Defendant's confession was obtained directly as a result of this promise, see Braxton, 112 F.3d at 780 (holding that confessions are involuntary if "obtained by any direct or implied promises, however slight") (quoting Hutto v. Ross, 429 U.S. 28, 30 (1976)) (emphasis added), it and other misrepresentations are significant factors the Court considers among the totality of circumstances.

The manner of Defendant's interrogation also became quite coercive. Although Detectives Sumner and Sampson began by questioning Defendant about the break-ins in an aggressive but permissible manner, they responded to Defendant's initial cooperation by escalating their tactics in the hope of obtaining further incriminating statements. It was at this point that the interrogation changed from aggressive to what can only be described as coercive and relentless.

Over the next two and one-half hours, Defendant was told repeatedly that his case was hopeless. He was told repeatedly that he really wanted to confess despite his statements that he wished to do no such thing. During questioning by Detectives Wilson and McSwain, Defendant indicated that he wanted to end the interrogation and invoke his right to silence. (TR at 182). Questioning should have ceased at that moment; instead, Detective Wilson ignored Defendant's request and continued to berate him. When Wilson and McSwain were unable to extract a confession, Defendant was transported to the Gaston County Jail for charging, where he was met by Detectives Sumner and Sampson once again. Critically, the felony-

murder charge had yet to be disclosed. The obvious design behind concealing this charge during the prior interrogation was that revealing it at Defendant's charging would complete the final step in an orchestrated and calculated effort to override his will.

Given these facts, the Court does not find credible Detective Sampson's testimony that Defendant re-initiated questioning at the presentment of his charges by asking "What can I do to help myself?" This finding is based on the coercive nature of the preceding interrogation, Sampson's mediocre reading of Defendant's Miranda rights, and the fact that the presentation of Defendant's charges was an attempt to elicit his confession rather than a standard booking. Thus, the coercive interrogation methods applied earlier remained ongoing and had not been dissipated by the break in time and location resulting from Defendant's transport to the Gaston County Jail. See Oregon v. Elstad, 470 U.S. 298, 310 (1985) (noting that the passage of time, a change in location, and a change in the identity of interrogators could dissipate coercive police activity). Although none of these details may have created a coercive environment by itself, their cumulative effect was extremely coercive.

### III. CONCLUSION

Based upon the totality of circumstances present at the time Defendant gave his confession to attempted bank robbery at the Gaston County Jail, the Court concludes that Defendant's will was overborne and his confession was therefore involuntary. Cristobal, 293 F.3d at 140; Pelton, 835 F.2d at 1071. Accordingly, the confession is inadmissible under 18 U.S.C. § 3501. The Court notes that its conclusion rests upon the compelling facts present in this case. The coercive interrogative tactics employed by Detectives Sumner, Sampson, Sergeant Reynolds, and Detectives Wilson and McSwain exceeded the bounds of permissible police conduct. Exclusion of the evidence in this case accomplishes the salutary

purpose of the exclusionary rule—to deter similar conduct by law enforcement in the future. See United States v. Perez, 393 F.3d 457, 460 (4th Cir. 2004) ("The 'prime purpose' of the judicially created exclusionary rule is 'to deter future unlawful police conduct . . . .'") (quoting United States v. Calandra, 414 U.S. 338, 347 (1974)).

**IT IS, THEREFORE, ORDERED** that evidence of Defendant's "jailhouse" confession to bank robbery given on September 27, 2008, at the Gaston County Jail is inadmissible in his criminal trial.

Signed: December 4, 2009

Robert J. Conrad, Jr.
Chief United States District Judge